RAMSEY *v.* CAPSHAW.

Opinion delivered June 6, 1903.

CONTRACT—BREACH—LOSS OF PROFITS AS DAMAGES.—Plaintiffs entered into a contract with defendant whereby they agreed to furnish a certain quantity of timber to be cut by him at a stipulated price, and, to enable him to buy a sawmill for the purpose, agreed to let the amounts due him be credited on the purchase price of the sawmill. The vendor of the sawmill took notes for the purchase money, in which they retained title until payment of the purchase price. Subsequently the vendor of the sawmill transferred the purchase notes to plaintiffs, who brought replevin to recover the

sawmill. Defendant set up a counterclaim, alleging that plaintiffs violated their contract by refusing to furnish him the stipulated amount of timber, and that, if they had done so, he would have received a profit in the sum exceeding the notes sued on. *Held*, that the loss of such profit was the result of the nonperformance of plaintiffs' contract, and was within the contemplation of the parties, and that, if it equaled or exceeded the amount due for the purchase of the sawmill, defendant was entitled to judgment in the replevin suit.

Appeal from Monroe Circuit Court.

GEORGE M. CHAPLINE, Judge.

Affirmed.

STATEMENT BY THE COURT.

J. J. Ramsey & Brother commenced an action of replevin in the Monroe circuit court against W. A. Capshaw to recover the possession of certain sawmill machinery, of which they alleged he held unlawful possession.

The defendant answered and alleged:

"(1.)    That the plaintiffs are not the owners of the property described in the complaint, nor are the plaintiffs entitled to the possession thereof; and denies any knowledge or information of such ownership sufficient to form a belief; denies that he is in unlawful possession of said property or any part thereof, and denies that he unlawfully detains property from the plaintiffs, as is alleged in the complaint.

"(2.)    For further defense, defendant alleges that on or about the 1st day of January, 1900, he entered into a contract with the plaintiffs to pay to them the sum of $885.28 for the purchase money of the property described in the complaint, the same being a sawmill outfit and other money advanced and to be advanced by the plaintiffs. That since that time, on different days, he has paid to plaintiffs upon said indebtedness the sum of $542.45, by the sawing of lumber for the plaintiffs under a contract. That at the same time and date, and as a part of said contract, the plaintiffs entered into a contract with defendant to furnish defendant 1,000,000 feet of oak timber to be sawed by the defendant for the plaintiffs at an agreed price of $6.25 per thousand feet, as a means by which the defendant could pay for said sawmill. That the plaintiff failed and refused to comply with their contract by furnishing to

him the said 1,000,000 feet of timber to be sawed at said price, except a portion thereof. The defendant alleges and will show that after plaintiffs had furnished a portion of the timber agreed upon to be sawed, to-wit, about 500,000 feet, the plaintiffs, in violation of their contract with the defendant, refused thereafter to furnish the balance of said timber for defendant to saw for them, although defendant has been at all times ready and willing to perform his contract in reference thereto, and demanded of plaintiffs that said contract to furnish said timber be complied with. The defendant states that he is now, and has been at all times since entering into said contract, prepared to carry out contract with the plaintiffs in the sawing of said timber for them, which fact the plaintiffs well know; but the plaintiffs have wilfully declined and refused to comply with their said contract, as hereinabove stated. The defendant states that there was a net profit to him under said contract with the plaintiffs in the sawing of said timber of the sum of $2 per thousand feet, and he alleges that he is entitled to recover from the plaintiffs said sum of $2 per thousand feet for such portion of the timber which the plaintiffs refused and declined to deliver to him under said contract, to-wit, 500,000 feet. The defendant states that, after allowing the plaintiffs the sum of $342.83, the balance due plaintiffs from defendant at the time plaintiffs violated their contract with defendant, as herein stated, when they refused to allow defendant to cut said timber and refused to furnish him with said timber to be cut for them under said contract and agreement, there is due defendant from the plaintiffs the sum of $657.17. Wherefore defendant prays judgment for said sum and costs."

Plaintiff replied, and denied the allegations of the answer, and demurred to the second paragraph of the same. The demurrer was overruled.

The jury impanelled to try the issues in the action returned a verdict in favor of the defendant. Judgment was rendered accordingly; and plaintiffs appealed.

On the 29th day of September, 1899, James A. Sain purchased of the Southern Engine & Boiler Works the property in controversy, on condition that the title to the same should remain in the vendor until the purchase money was paid. Three notes, in which the condition of the sale was recited, were executed by the purchaser to the vendor. Sain sold the property to the appellee on the same condition. On the 5th of June, 1900, appellants pur-

chased two of the notes, the other having been paid; and the Southern Engine & Boiler Works transferred the same to them by an indorsement thereon as follows: "For value received we hereby transfer the within note to J. J. Ramsey & Brother, together with all our right and title to this property, without recourse on us at law or in equity. This June 5th, 1900. [Signed] Southern Engine & Boiler Works. E. Burkitt, Secretary." By virtue of this purchase and transfer appellants claim possession of the property in controversy; alleging that the notes are unpaid. The question in the case is, have the notes been paid?

Evidence was adduced in the trial tending to prove the following facts: "Appellants were the owners of 640 acres of timbered land in Monroe county, in this state. They were dealers in hardwood lumber, rough plow, wagon and chair material, with their home office in Shelbyville, Ky. They were anxious to have the oak timber on this land sawed into such material as they handled. They established a branch office in Brinkley, in this state, with Thomas Jesse as their general agent and manager.

"Jesse went to J. A. Sain about the first of September, 1889, and asked him to take a contract to saw 1,000,000 feet of oak timber for the plaintiffs. Sain told Jesse that he did not own a sawmill, and had no money to buy one. Jesse said to Sain that, if he would agree to cut that amount of timber for the appellants, they would pay him $3.75 per thousand feet to saw it, and $2.50 per thousand feet to haul it out of the woods to the mill. He further proposed to Sain at the same time to furnish him with money to pay his expenses to Jackson, Tenn, to get a sawmill from the Southern Engine & Boiler Works, and, if he would buy the mill, that the appellants would advance $500 for Sain to the Engine & Boiler Works people, and that, if Sain did not buy the sawmill, and did not close the trade with them, Sain would not owe the appellants anything on account of his expenses in making the trip.

"Sain went to Jackson, Tenn., and bought the sawmill outfit pursuant to Jesse's request. Before going, Sain and Jesse made a contract covering the purchase of the mill, how it was to be paid for, and what the appellants were to do. They were to cut 1,000,000 feet of timber on their land in Monroe county; Sain was to haul it to the mill, and saw it at the rate or price proposed; and appellants were to pay the amount due therefor, as the same was done, to the

Southern Engine & Boiler Works in part payment of the debt contracted by the purchase of the sawmill until the same was paid. It was also agreed that all money loaned to Sain or advanced to him to defray the expenses of running the sawmill and hauling the timber should not be collected or deducted out of the money due on the contract of sawing and hauling until after the sawmill debt was paid in full. Not only this, but it was expressly agreed that the .appellants would advance such money to Sain as was necessary to pay the hands and running expenses of the sawmill, and, as stated above, this was not to be paid until after the debt due for the· machinery and sawmill outfit was fully paid.

"Sain bought the sawmill outfit from the Southern Engine & Boiler Works after this agreement was made, on a credit and on condition that the title to the same should remain in the vendor until the purchase money was paid, erected his sawmill plant, and went to work sawing and hauling the oak timber, and continued operating the mill under his contract until January, 1900.

"The representative of the Southern Engine & Boiler Works brought the notes for the purchase money to Brinkley, pursuant to Sain's request, to have Sain sign them. When he came to Brinkley with the notes ·for Sain to sign, Jesse, Sain and the agent of the Engine & Boiler Works talked about the contract of appellants and Sain. Jesse refused to reduce it to writing, and Sain did not sign the notes.

"About the first of January, 1900, Sain explained to appellee the terms of his contract with appellants, and informed him that Jesse, their agent, had neglected to reduce it to writing, and offered to sell the mill to him (appellee). . They (appellee and Sain) then went to Jesse, and he explained the contract he and Sain had made, and told appellee that appellants would be glad to make the same contract with him. They agreed upon terms, and made the same contract that Sain made, except appellee assumed the indebtedness of Sain to appellants, which extended from about the first of October, 1899, to the first of January, 1900, and amounted, as they agreed, to $385.28; and they stipulated that it should be paid in the same manner Sain undertook to pay it, that is to say, out of the amount earned by hauling and sawing under their contract, and after the full payment of the amount contracted to be paid for the machinery.

."Thereupon appellee purchased the machinery from Sain, and agreed to assume his indebtedness therefor; and thereafter, on the 10th day of January, 1900, he and Sain executed the notes to Southern Engine & Boiler Works for the price of the machinery, dating them the 29th of September, 1899, the day of the purchase by Sain. The notes were indorsed as follows:

"'We hereby release J. A. Sain from payment of the within note by W. A. Capshaw assuming same and taking the place of J. A. Sain, but in so doing it is fully understood and agreed that we do not release our title retained, or in any way damage our lien on the machinery and property for the purchase money, which is not to be released till the notes are paid up in full.

" 'This January 11th, 1900.

"Southern Engine & Boiler Works.

" 'I fully agree to above and assume payment.

" 'This January 11th, 1900.

" 'W. A. Capshaw.' "

"Appellee took possession of the machinery, and operated it until the 16th of August, 1900, when appellants refused to allow him to saw any more lumber for them, and ordered him to close the mill. He was compelled to discharge his employees and cease operating the machinery, because he had not the timber, and could not get it to saw, and he could not find a sale for lumber. He had up to this time sawed under his contract 579,726 feet, and 427,274 feet still remained to be hauled and sawed. He had earned two dollars per thousand feet net profit, and would have continued to earn it if he had been permitted to do so. The amount of profit earned and that he could have earned by the performance of his contract with appellants was more than sufficient to pay the notes for the purchase money. He offered to perform his contract, but appellants would not allow him to do so."

Other evidence tending to sustain appellant's claim was adduced, but it is unnecessary to say anything about it in this opinion.

The following, with other instructions, were given by the court to the jury, over the objections of appellants:

"2. If the jury believe from the evidence that the sum of money due the defendant under his contract with the plaintiffs was, by agreement with Jesse, to be used and applied to the payment, first, of the notes given for the machinery, and that such sum, at the commencement of the suit or demand of delivery of the property,

was sufficient to pay off the notes, your verdict will be for the defendant."

"3. If the jury believe from the evidence that the plaintiff, through his agent, Jesse, entered into a contract with the defendant to furnish him one million feet of timber to be hauled and sawed by the defendant, and that the defendant was carrying out his contract, and that the plaintiff, without fault on the part of the defendant, and over the objections of the defendant, ordered the defendant, through his agent, not to complete his contract, and that the plaintiffs at any time notified the defendant not to complete his contract in the sawing of the balance of said timber, the defendant would be entitled to recover in this action from the plaintiffs such sum as he would have earned as a profit under the contract, provided the same exceeds the amount due by the defendant to plaintiffs on notes and accounts."

*C. F. Greenlee,* for appellants.

The sale of a chattel upon condition that the title shall remain in the vendor until the purchase price is paid vests no title in the purchaser until payment. 48 Ark. 160, 273; 57 Ark. 270. Payment should have been made as the notes directed. 4 Ark. 154; 20 Ark. 203; 19 Ark. 690; 49 Ark. 285; 40 Ark. 117; 55 Ark. 347; 67 Ark. 66; 65 Ark. 333. It was error to admit testimony showing loss of profits. 34 Ark. 184; 36 Ark. 518; 57 Ark. 203; 64 Ark. 510.

*M. J. Manning,* for appellee.

A closed account, when stated, is not subject to further inquiry. 13 Ark. 609. The account was a stated one, and binding on appellants. 41 Ark. 502; 47 Ark. 541; 53 Ark. 155. A payment on a running account, in the absence of appropriation, should be applied to the earliest item of the debt. 57 Ark. 274; 34 Ark. 285. Appropriation cannot be made to a debt not due without the debtor's consent. 47 Ark. 111. The creditor must follow the debtor's direction in the application of payment. 54 Ark. 144. Appellee's counterclaim arises out of the transaction, and is connected with the subject of the action. Sand. & H. Dig. § 5723. The profits are recoverable. 61 S. W. 273; 58 N. W. 477; 45 N. W. 378; 36 N. W. 88; 29 N. W. 710; 64 Ark. 510. The judgment was right upon the whole case, and will not be reversed for error in charging the jury. 4 Ark. 525; 14 Ark. 114; 10 Ark. 53; 19 Ark. 96; 21 Ark.

469; 10 Ark. 9; 44 Ark. 556; 43 Ark. 296; 46 Ark. 542; 37 Ark. 238.  The error was not prejudicial.  8 Ark. 313; 27 Ark. 306; 43 Ark. 535, 219; 51 Ark. 132; 46 Ark. 485; 50 Ark. 68; 33 Ark. 811; 34 Ark. 93.  The bill of exceptions is insufficient.  Sand. & H. Dig. §§ 5844-5849; 56 Ark. 600; 57 Ark. 7.

BATTLE, J., (after stating the facts).  The loss of profits sustained by appellee on account of the failure of appellants to perform their contract with him was the direct result of such non-performance, was reasonably within the contemplation of the parties, and was sufficient to defeat appellant's right to recover in this action, provided the same was equal to or exceeded the amount due on the notes given for the property in controversy.  *Ames Iron Works* v. *Rea,* 56 Ark. 450; *Gibney* v. *Turner,* 52 Ark. 117; *Railway Co.* v. *Beard,* 56 Ark. 309, and 60 Ark. 151.

Appellants say that "it was error to admit testimony to prove that the purchase money was to be paid in a different way from what is shown on the face of the notes."  This testimony was not admitted for the purpose of varying or contradicting the contract evidenced by the notes, and did not do so.  There were two contracts. One was made with the Southern Engine & Boiler Works, and is evidenced by the notes.  The other was with the appellants, and is not in writing.  The testimony was admissible to prove what it was.

The evidence was sufficient to sustain the verdict of the jury.

We find no error in the proceedings of the circuit court prejudicial to appellants.

Judgment affirmed.