Sumlin *v.* Woodson.

4-8076 and 4-8077 (consolidated)          199 S. W. 2d 936

Opinion delivered March 3, 1947.

*W. W. Shepherd* and *Henry E. Spitzberg,* for appellant.

*Talley & Owen* and *Robert L. Rogers II,* for appellee.

Ed. F. McFaddin, Justice. Appellee, Woodson, sued appellant, Sumlin, for unlawful detainer (§ 6035, *et seq.,* Pope's Digest), and recovered damages which are challenged by this appeal.

Woodson owned a stock of groceries and fixtures and a building located at 716 West Third Street, Little Rock. He did not own the land on which the building was situated, but had a ground lease (paying therefor $20 per month), and had the right to remove the building. Woodson had operated a grocery store in the building from November, 1943, to March, 1944, when, for a cash consideration of $1,750, Woodson sold to Sumlin the stock of groceries and the fixtures, and also rented Sumlin the building for $27 per month. In October, 1944, Woodson demanded rent of $40 per month. After some negotiations Sumlin agreed to pay rent at $30 per month, and also to give Woodson and his family a discount of 20 per cent. on all groceries that they purchased from Sumlin. This rental agreement continued until November, 1945, when Woodson duly notified Sumlin to vacate the building on January 1, 1946.

Sumlin refused to vacate, and in January, 1946, Woodson, after giving statutory notice, brought this action of unlawful detainer. Sumlin gave cross bond, and retained possession of the building until the trial below (April 17, 1946), which resulted in a judgment for Woodson for (1) possession of the building; (2) rent at $60 per month from January 7, 1946; and (3) $300 as damages for unlawful detention. Sumlin has appealed to this court. Originally, there were two appeals, one based on the trial of April 17, 1946, and the other based on the refusal of the court to grant a new trial on the ground of newly-discovered evidence; but, with becoming candor, Sumlin's counsel have limited the issues on these appeals to two assignments. Appellant's counsel thus states his contentions:

"The issues on appeal having been confined solely to the award of damages, appellant will discuss only his assignments of error dealing with that phase of the case. Two general topics present themselves: (1) the award

of rentals at $60 per month; and (2) the verdict of $300 as damages for loss of profits.''

We proceed, therefore, to ascertain whether the evidence is sufficient to support the jury's verdict for (a) rental value and (b) damages.

I. *Rental Value.* The jury fixed the rent at $60 per month from January 7, 1946, and appellant says there is no competent evidence to sustain such a figure.

Appellee testified that, beginning January 1, 1946, the amount he paid for ground rent was increased from $20 per month to $42 per month. So, the rental fixed by the jury ($60 per month) only netted appellee $18; whereas, before January 1, 1946, appellee (paying ground rent of $20 per month, and receiving from appellant $30 per month) had netted $10 per month, plus 20 per cent. discount on groceries. We mention this as tending to show that appellee was not receiving any appreciable net increase at the $60-per-month figure fixed by the jury for rent after January 1, 1946.

But the cogent evidence is found in the fact that the appellee testified that he had been offered $60 per month as rent for the building occupied by the appellant, and that $60 per month was a reasonable rent. Appellee did not have to qualify as an expert in matters of realty rentals in order to state what he had been offered as rent for the building. In *Reeves* v. *Romines,* 132 Ark. 599, 201 S. W. 822, Mr. Justice HART, in discussing rental value and how it could be ascertained in an unlawful detention action, said:

''By rental value is meant, not the probable profits that might accrue to the tenant, but the value, *as ascertained by proof of what the premises would rent for,* or by evidence of other facts from which the fair rental value may be determined.'' (Italics our own.)

It is thus clear that ''what the premises would rent for'' is not the only way, but is at least one way, of ascertaining the rental value in an unlawful detainer action. The appellee stated what he had been offered as rent for

the premises, and he was not disproved on the point. His testimony, with the other facts as previously mentioned, is sufficient to support the jury's verdict fixing the rent at $60 per month from January 7, 1946.

II. *Damages for Loss of Profits.* In addition to the rents, Woodson sought $500 as damages for the unlawful detention of the premises. The only element of damages that Woodson attempted to prove was the profit that he claimed he would have made from operating a grocery store in the building from the date of the filing of the action to the time of the trial; and the jury awarded him $300 for such damages. The appellee says that § 6050, Pope's Digest, lists "profits" as an item of damages; and this statute is urged by appellee to sustain the verdict for damages. To ascertain and determine the purpose and effect of § 6050, Pope's Digest, we need to consider it historically.

This section is § 5 of Act 8 of 1891. Prior to this Act of 1891 this court held that damages for the detention of the premises could not be recovered by the landlord in the unlawful detainer action. Some of the cases so holding are *Keller* v. *Henry* (1867), 24 Ark. 575; *Walker* v. *McGill* (1882), 40 Ark. 38; and *Poe* v. *Bradley* (1884), 44 Ark. 500. To overcome the effect of these cases, and to allow the landlord to receive his rents and damages in the unlawful detainer action, the Legislature enacted § 5 of Act 8 of 1891; and this section stated that the landlord could recover as damages in the unlawful detainer action:

(1) "rent . . . up to the time of rendering judgment, . . ." or

(2) "value of the use and occupation" of the premises; or

(3) "the rents and profits thereof during the time the defendant has unlawfully detained possession, as the case may be, and damages for withholding the same, . . ."; or

(4) "damages to which said plaintiff may be entitled on account of the forcible entry and detainer of

such premises, . . ." This § 5 of Act 8 of 1891 was discussed by Mr. Justice HUGHES in *Richardson* v. *Harrell*, 62 Ark. 469, 36 S. W. 573.[1] It must be remembered that the action for unlawful detainer lies for a farm, or a residence, or a store building, or other kind of property; and that the damages to the landlord are to be ascertained and determined, depending on the type of property, etc. It is therefore evident that the purpose of the 1891 act was to point out the methods of determining damages, and then to allow the court to direct the jury as to the measure of damages applicable to the particular case on trial: the main idea being that the landlord was entitled to the damages which he proved with reasonable certainty, as flowing directly and proximately from the unlawful detention.

Whether "profits" as used in § 6050, Pope's Digest, means (a) profits from the rents, or (b) profits from the building, or (c) profits from the business carried on in the building, is a question we do not now decide; because, in the case at bar, the plaintiff's loss of profits is entirely speculative. In each of the various cases decided by this court in which losses of profits have been allowed as damages, it has been expressly or impliedly stated that such profits must be capable of proof with reasonable certainty, and that no recovery can be had for loss of profits where it is uncertain or speculative whether there would ever have been any profits. See *Black* v. *Hogsett,* 145 Ark. 178, 224 S. W. 439. This is but another way of saying that damages cannot be based upon conjecture and speculation.

---

[1] Paragraph 6050, Pope's Digest, deals with damages the landlord may claim against a tenant who has unlawfully withheld possession. *Coley* v. *Westbrook*, 206 Ark. 1111, 178 S. W. 2d 991, is a case dealing with the landlord's damages. Also, there is an annotation in 39 A. L. R. 386 on "Measure of damages for tenant's failure to surrender possession of rented premises," which shows the holdings of courts of other states, but based on statutes somewhat different from our own. Section 6052, Pope's Digest, deals with the damages the tenant may recover from a landlord who has unlawfully evicted him. The difference in the wording of these two sections is worthy of note. The following cases deal with the tenant's damages under § 6052: *Brockway* v. *Thomas*, 36 Ark. 518; *McElvaney* v. *Smith*, 76 Ark. 468, 88 S. W. 981, 6 Ann. Cas. 458; *Byers* v. *Moore*, 110 Ark. 504, 163 S. W. 147; *Wakin* v. *Morgan*, 165 Ark. 234, 263 S. W. 783.

In *Harmon* v. *Frye,* 103 Ark. 584, 148 S. W. 269, in speaking of loss of profits as an element of recoverable damages, Mr. Justice KIRBY, speaking for this court, said:

"Such damages 'must be certain both in their nature and in respect to the cause from which they proceed. It is against the policy of the law to allow profits as damages, where such profits are remotely connected with the breach of contract alleged, or where they are speculative, resting only upon conjectural evidence or the individual opinions of the parties or witnesses.' 13 Cyc. 53. *Spencer Medicine Co.* v. *Hall,* 78 Ark. 336, 93 S. W. 985; *Beekman Lbr. Co.* v. *Kittrell,* 80 Ark. 228, 96 S. W. 988; *Hurley* v. *Oliver,* 91 Ark. 433, 121 S. W. 920." To the same effect, see, also, *St. L.-S. F. Ry. Co.* v. *Spradley,* 199 Ark. 174, 133 S. W. 2d 5; and *S. W. Tel. & Tel. Co.* v. *Memphis Tel. Co.,* 111 Ark. 474, 163 S. W. 1153, and earlier cases there cited. See, also, West's Arkansas Digest, "Damages," § 40, 124, 176, listing other cases from this court. See, also, 17 C. J. 758, 788 and 910 for general discussion. (25 C. J. S., Damages, §§ 28, 43, 90.) In 15 Am. Juris. 560, after giving the general statements from leading cases, this rule is deduced:

"It has been said that the most definite rule that can be drawn from the cases would seem to be that if by any chance or under any condition of affairs then existing the profits might not have accrued though the wrongful act had not intervened, there can be no allowance of profits lost as damages; but if, except for the wrongful act, there must have been profits, notwithstanding any other circumstances existing at the time of the perpetration of the wrong, the question of their speculativeness and contingency is absolutely negatived."

Tested by our own cases, as well as the general rule above stated, we are convinced that the profits, claimed by Woodson in this case, were never removed from the realm of conjecture and speculation, because it is uncertain from the evidence whether any profit would ever have accrued to him. Woodson claimed that he would have operated a grocery store in the building if Sumlin had surrendered possession, and that Woodson would

have made a gross profit of 25 per cent. on all sales. In his attempt to show what these sales might have been, Woodson showed: (a) his own gross sales in this building in January and February, 1944, to have been $1,074 and $1,042.97, respectively; and (b) Sumlin's gross sales in this building for January and February, 1946, to have been $3,807.54 and $3,242.69, respectively.

If we take Woodson's gross sales of January and February, 1944, as the basis of calculation for showing net profits, we get a gross profit of approximately $250 each month; and from this last-mentioned figure must be deducted utility bills, taxes, extra help and a reasonable amount for the value of Woodson's own time and services. No figures are in the record showing any of these deductible items: so it was not shown that Woodson would have had any net profits based on his own previous operations, even if such operations were not too remote in time to be used as a standard.

If we take Sumlin's gross sales for January and February, 1946, as the basis of calculation, to support Woodson's claim of net profits, we are beginning the calculation with the rankest sort of conjecture and speculation, because no one testified that Woodson was as good a merchandiser or salesman as Sumlin. Sumlin's record of gross sales affords not the slightest indication as to what Woodson might have sold. Sumlin had a volume of sales treble that of Woodson; but Sumlin had a meat market in the store, he paid a butcher $55 a week; and the record is silent as to what part of Sumlin's gross sales came from the grocery business, as distinct from the meat market. Woodson never testified that he intended to operate a meat market.

We have pointed out sufficient of these matters to indicate the conjecture and speculation on which the verdict was necessarily based. The testimony, regarding loss of profits, in the case at bar is no more definite than was the testimony on the same question in the case of Beasley v. Boren, 210 Ark. 608, 197 S. W. 2d 287, and in that case we said:

"The testimony introduced by appellees as to loss of profits which appellees thought they suffered . . . was not sufficiently definite to sustain the verdict of damages to appellees on these grounds, even if it should be held that such damages are recoverable in an action such as this.

"There was introduced in evidence no such records or data as would sustain appellee's theory as to their loss of profits, and Mr. Boren's testimony as to what profits appellees would have earned from their business at the new location was at best a mere conjecture on his part."

The context of the above quotation applies with equal force to the case at bar. When a party embarks on the enterprise of recovering anticipated profits, he must present a reasonably complete set of figures, and not leave the jury to speculate as to whether there would have been any profits. Woodson failed to fulfill his burden in this regard; and the verdict of $300 for loss of profits is based on conjecture and speculation, and cannot be allowed to stand.

We, therefore, modify the circuit court judgment by vacating the judgment of $300 for damages, and in all other respects we affirm the judgment of the circuit court, with the appellant to recover his costs in his court.